**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SCOTT R. MARCUM AND KERSTIN MARCUM,**<br>　　　　　**Plaintiffs,**<br><br>　　　**v.**<br><br>**COLUMBIA GAS TRANSMISSION, LLC, COLUMBIA GAS TRANSMISSION COMMUNICATIONS CORPORATION, CROWN CASTLE INTERNATIONAL CORP. AND PERCHERON, LLC,**<br>　　　　　**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  19-3873** |

## <u>MEMORANDUM OPINION</u>

This suit arises from the installation of a gas pipeline through the residential property of

Plaintiffs Scott and Kerstin Marcum.  Plaintiffs allege that the flow of stormwater runoff onto

their property increased following the installation, resulting in property damage.  They blame the

pipeline's owner, Defendant Columbia Gas Transmission, LLC ("Columbia"), which, they say,

failed to restore the property with sufficient stormwater management controls.  They bring

claims for: (1) negligent construction and failure to maintain; (2) violation of the Pennsylvania

Storm Water Management Act ("SWMA"), 32 Pa. Stat. Ann. § 680.13; (3) nuisance; (4) trespass

to land by alteration of surface and subsurface drainage; and, (5) breach of fiduciary duty to

maintain.[1]  Columbia moves to exclude the testimony of Plaintiffs' liability expert, Chad Ingram,

and for summary judgment.

## I.　　　BACKGROUND

The property in question has been subject to a pipeline easement since 1957, when the

original owner entered into a Right of Way Agreement with Columbia's predecessor granting the

---

[1] Plaintiffs alleged a claim of fraudulent concealment against Columbia but withdrew this claim in response to Columbia's summary judgment motion.

latter the right to install and operate a 10-inch underground gas pipeline through the premises.

Plaintiffs bought the property in 1998.  Shortly thereafter, they were approached by Columbia, which sought to amend the 1957 Agreement.  Specifically, it proposed replacing the existing 10-inch pipeline with a 24-inch pipeline (the "1896 line").  Plaintiffs wouldn't agree to the amendment, so Columbia initiated a condemnation action as authorized by the Natural Gas Act, 15 U.S.C. § 717f(h).  That litigation was resolved in 2002, when Plaintiffs entered into an amended Right of Way Agreement with Columbia for the installation, operation, and maintenance of the 1896 line (the "2002 Amendment").

A few years later, an agent for Columbia approached Plaintiffs seeking to amend the 2002 Amendment.  Columbia wanted to install another pipeline—this one 26-inches in diameter (the "1278 line").  In 2014, after consulting with an attorney, Plaintiffs entered into a second amended Right of Way Agreement with Columbia for the installation, operation, and maintenance of the 1278 line (the "2014 Amendment").  In conjunction with the 2014 Amendment, Plaintiffs executed a release of claims.  In return Plaintiffs received $35,000 from Columbia.

Columbia sought permission for construction of the 1278 line from the Federal Energy Regulatory Commission ("FERC") and applied for various state permits.  In support of its applications, Columbia submitted to FERC, the Pennsylvania Department of Environmental Protection ("PADEP"), and the Chester County Conservation District ("CCCD") an updated Erosion and Sediment Control Plan as well as Post Construction Storm Water Management and Site Restoration Plans for review and approval.  FERC approved the 1278 pipeline on December 18, 2014.  In February 2015, the CCCD in conjunction with the PADEP issued to Columbia an Erosion and Sediment Control General Permit ("ESCGP-2").  The following month, FERC

issued a notice to proceed with construction of the 1278 line through Plaintiffs' property.

Columbia installed the 1278 line in the summer of 2015. The construction process was not entirely smooth. Plaintiffs' property is located downslope from two other properties. To prevent excess stormwater from running down this slope and entering Plaintiffs' property during construction, Columbia installed temporary erosion and sediment ("E&S") controls. These controls were overburdened in July by a significant overnight rain. Stormwater runoff flowed toward Plaintiffs' home, leaving sediment deposits on their rear patio and yard. Columbia installed additional E&S controls in response, but these too were overwhelmed during an August storm, resulting in washout of the restored easement area.

There were, from Plaintiffs' perspective, issues with Columbia's post-construction site restoration efforts as well. According to Plaintiffs, prior to the 2015 construction, there were several water diversion features on the properties of Plaintiffs and their uphill neighbor which served to lessen the flow of stormwater onto Plaintiffs' property. They contend, primarily, that upon finishing construction of the 1896 line in 2002, Columbia built a water diversion berm—a retentive grading technique used to manage stormwater runoff—in the easement area across Plaintiffs' backyard. The purpose of this berm, according to Plaintiffs, was to divert enhanced stormwater runoff resulting from the 2002 construction away from Plaintiffs' home, allowing it to instead drain to the side of Plaintiffs' house and into culverts in the street below. Plaintiffs contend that Columbia removed this berm when installing the 1278 line and failed to replace it when restoring the site.

Columbia disputes these facts. It agrees, however, that there were certain permanent berms located on the property immediately uphill from Plaintiffs' own which were removed and replaced during the 2015 construction. The parties now dispute whether these replacement

3

berms serve to concentrate, rather than disperse, stormwater runoff toward Plaintiffs' home. Columbia also acknowledges that, as part of the construction process, a number of trees were cleared from Plaintiffs' property as well as from the property of Plaintiffs' uphill neighbor. These trees were not replaced. The parties dispute whether Columbia undertook any stormwater remediation measures in the formerly wooded area, such as cultivating brushy vegetation to help slow the velocity of stormwater and surface runoff coming down the hillside.

According to Plaintiffs, since the 2015 installation of the 1278 line, increased stormwater runoff has caused significant damage to their home and property including, in February 2018, the formation of a large and growing sinkhole within the easement area. Plaintiffs filed this action shortly thereafter.

## II.      COLUMBIA'S *DAUBERT* MOTION

Plaintiffs proffer Chad Ingram, an engineer, to testify regarding the effect of the pipeline construction on stormwater flow. Plaintiffs contend that Ingram's reports and testimony in this matter support their allegation that Columbia's failure to install adequate stormwater controls increased the flow of runoff onto their property. Columbia moves to exclude Ingram's testimony and opinions pursuant to Federal Rule of Evidence 702.[2]

### A. Legal Standard

The Federal Rules of Evidence govern the admission of expert opinions in a federal case.

---

[2] Columbia separately moves to exclude the testimony and opinions of James Tupitza, a real estate attorney proffered by Plaintiffs to testify regarding customs and practices in pipeline condemnation and construction litigation. Tupitza has authored an eight-page report responding to four hypothetical questions posed by Plaintiffs' counsel. Most of his opinions involve matters—specifically, the release executed by Plaintiffs in conjunction with the 2014 Amendment and Plaintiffs' breach of fiduciary duty claim—which, even if they were appropriate matters for expert opinion, will not be relevant at trial given the Court's disposition of these issues in the present opinion. It is thus unclear whether and to what extent Plaintiffs will continue to proffer Tupitza as an expert witness moving forward. Given that the substance of Tupitza's opinions is not relevant to the Court's disposition of its summary judgment motion, Columbia's *Daubert* challenge will be denied without prejudice to raise again should Plaintiffs seek to put Tupitza on the stand at trial.

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587-89 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This rule "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Qualification requires "that the witness possess specialized expertise." *Id.*  To be reliable, the expert's opinion must be premised on more than mere "'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590).  Finally, the expert's testimony must "fit" the case at hand, that is, "must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F.3d at 405).  When a party challenges an expert's opinions pursuant to Rule 702, the proffering party bears the burden of demonstrating by a preponderance of the evidence that the opinions of its proposed expert are admissible. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999).

The proffering party is not, however, required to "carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st

Cir. 1998)); *see also Paoli*, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").  Trial courts must act as gatekeepers to ensure the relevance and reliability of all expert testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), but this gatekeeping obligation "is not intended to serve as a replacement for the adversary system," Fed. R. Evid. 702, advisory committee's note.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.  Discussion

Plaintiffs retained Ingram through his firm, Ingram Engineering Services, Inc. ("IES"), to investigate the increased stormwater runoff they observed on their property during and following construction of the 1278 line.  Ingram drafted his first report in April of 2016.  After visiting the property, he opined, *inter alia*, that "[t]he grading of the easement [was] restored in such a manner that conveys additional storm water toward the rear and east side of the property."  He concludes:

> that post-construction failures are caused from the inadequate re-grading performed during the restoration process.  IES suspects that a diversion berm existed before the construction which conveyed stormwater properly into the street and away from the rear and sides of [Plaintiffs'] property.  During construction activities for the pipe installation, the berm was removed during final grading operations.  Once the pipe installation was completed, the area was re-graded which resulted in a significant increase in stormwater being conveyed toward the rear and side yards rather than towards the street.  In addition to the improper conveyance, the grading has allowed excessive flow rates which have caused erosion and sediment run-off[.]

Ingram returned to Plaintiffs' property in early 2018 after the sinkhole began to form and authored a second report, which reiterated his findings concerning the inadequacy of Columbia's post-construction site restoration measures and the removal of the water diversion berm.  In the

report, he notes that "IES estimates the volume of stormwater doubled based upon the location

of" the removed berm.  He also provides an opinion on the cause of the sinkhole, explaining that

it:

> is likely due to the presence of carbonite geology (soluble limestone) or improper
> backfill operation at this localized area.  A small swale immediately upslope of said
> subsidence/sinkhole has formed and conveys concentrated stormwater into the
> opening.  This is accelerating subsurface erosion and has created a safety hazard.

Ingram visited the property twice in September 2020, and thereafter authored his third

and final report.  The purpose of this report was "to determine if continued deterioration resulting

from stormwater runoff is observed [on Plaintiffs' property] as well as to evaluate the grading on

the subject property and upslope tributary drainage area within the pipeline easement."  Ingram

observed, among other things, continued erosion and deterioration at the property; stormwater

runoff continuing to culminate in the rear of Plaintiffs' property; water damage to Plaintiffs'

home; and additional surface depressions located in the area of the sinkhole.  The report notes

that Columbia did some work on the sinkhole in December 2018 but opines that poor soil

compaction around the pipeline and continued concentrated runoff in the area will continue to

produce subsidence on Plaintiffs' property.

Columbia does not question Ingram's qualifications, and the Court finds that Ingram—a

licensed Pennsylvania engineer who operates his own firm and worked on pipeline projects in his

former role as in-house township engineer—possesses the specialized expertise necessary to

opine on pipeline construction and stormwater flow.  Columbia does, however, dispute whether

Ingram's opinions on these issues are reliable and whether they fit the facts of this case.  Its

motion refers to only one of Ingram's opinion (elicited by defense counsel during Ingram's

expert deposition) namely that prior to Columbia's construction of the 1278 line, there was 88%

less stormwater entering Plaintiffs' property.  Nevertheless, Columbia seeks to exclude Ingram's

opinions and testimony in their entirety.

With respect to reliability, Columbia contends that Ingram's opinions are not based on sufficient facts and data and are, instead, based on nothing more than *ipse dixit*.  It points out that Ingram did not review, *inter alia*, Plaintiffs' depositions, stormwater flow rate data prior to Plaintiffs' purchase of the property, the plans associated with the 2002 construction of the 1896 line, or scientific data related to local precipitation between 2010 and 2020.  But an expert's opinion need not rest on perfect grounds:  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'" it should be subjected to the adversary process. *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche*, 161 F.3d at 85).  Ingram's opinions and testimony are based on his years of experience as an engineer, as well as his prior work on pipeline-related projects.  He conducted several post-construction site inspections and reviewed time-stamped pre-construction photographs and videos, construction-related documents and existing grading plans, and site-specific topographic and aerial data and images.  Whether Ingram should have done more research and performed more calculations is an appropriate issue for cross-examination at trial, *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (credibility and weight of expert testimony decided by factfinder); however, the Court finds that his opinions are based on a sufficient factual foundation and supporting methodology to survive the present motion.

With respect to the "fit" requirement, expert testimony is admissible under this prong if it "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quoting *Daubert*, 509 U.S. at 591). "This condition goes primarily to relevance.  Expert testimony which does not relate to any issue

in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.  The standard for

meeting the "fit" requirement "'is not that high,' but 'is higher than bare relevance.'"  *Schiff*, 602

F.3d at 173 (quoting *Paoli*, 35 F.3d at 745).  Ingram's opinions meet this standard:  They

squarely address the parties' fundamental factual disputes regarding the property's pre- and post-

construction topography and how the alleged topographical changes have increased stormwater

runoff.  They also address Plaintiffs' sinkhole and subsidence allegations, another issue central to

this litigation.  Columbia's motion to preclude Ingram from testifying in this matter will

therefore be denied.[3]

## III.    COLUMBIA'S SUMMARY JUDGMENT MOTION

Columbia next moves, pursuant to Federal Rule of Civil Procedure 56, for summary

judgment on all of Plaintiffs' claims.  The substantive law of Pennsylvania governs this diversity

action.  *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000).

### A.  Legal Standard

"[S]ummary judgment is appropriate where there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North*

*Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted).  In ruling on a

summary judgment motion, a court must "view the facts and draw reasonable inferences in the

light most favorable to the party opposing the summary judgment motion."  *Scott v. Harris*, 550

U.S. 372, 378 (2007) (internal quotations and alterations omitted).  "A genuine issue is present

when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor

---

[3] Columbia requests a *Daubert* hearing.  Courts have discretion to grant or deny such requests.  *Padillas*, 186 F.3d at 418 (the decision to hold a *Daubert* hearing "rests in the sound discretion of the district court").  In this case, because the full record on this issue is presently before the Court, including Ingram's several reports and deposition testimony, a *Daubert* hearing is unnecessary.  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (*Daubert* hearing properly denied where district court "already had before it the depositions and affidavits of the plaintiff's experts").

of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

### B. Discussion

As should be apparent from the case background, this matter is riddled with factual disputes concerning what Columbia did and did not do prior to constructing the 1278 line and during the post-construction site restoration process. Typically, such disputes would make summary judgment inappropriate. Columbia argues, however, that Plaintiffs' allegations and evidence fail to support their various claims. It further contends that Plaintiffs' claims are precluded by the release they executed prior to Columbia's work on the 1278 line, and raises certain timeliness concerns.

#### 1. The Release

Up first is whether the release executed by Plaintiffs in connection with the 2014 Amendment acts as a bar to their claims. The release is titled "Release of Specific Claims" and reads, in relevant part:

> [T]he undersigned hereby release and discharge Columbia Gas Transmission, LLC, its successors, assigns, affiliates, agents, contractors and subcontractors, from the below listed claims and damages to the date hereof caused by the laying, construction, maintenance, replacement, alteration or removal of its facilities or any other exercise of its rights[.]

It is unclear what specific claims and damages the parties intended to be released: Although the language of the release suggests that it applies only to "the below listed claims and damages," no such list appears within the document. Regardless, by its clear terms, the provision applies only to claims and damages "to the date hereof caused," that is, claims and damages incurred prior to the document's execution. Plaintiffs executed the release on May 21, 2014. Their claims all arise out of the construction and maintenance of the 1278 line, which did not begin until the

10

summer of 2015.  Because the release does not absolve Columbia from liability for its post-execution conduct, it does not bar the claims asserted in this suit.

### 2.  *The Statute of Limitations*

Another threshold issue is the extent to which the relevant limitations period bars recovery for Plaintiffs' alleged damages.  The parties agree that a two-year statute of limitations applies to each of Plaintiffs' claims.  *See* 42 Pa. Con. Stat. § 5524 (two-year limitations period applies to actions for "injuring personal property," actions based on "tortious conduct," and actions based "upon a statute for a civil penalty or forfeiture").  Plaintiffs filed this action on April 5, 2018.  Given the two-year limitations period, Columbia contends that Plaintiffs are precluded from recovering for damages sustained prior to April 5, 2016.  This would include, *inter alia*, damages stemming from Columbia's alleged failure to implement adequate E&S controls when constructing the 1278 line in the summer of 2015.

Plaintiffs agree with Columbia that damages incurred after April 5, 2016 are timely sought.  But they urge application of the discovery rule to permit them to recover for damages sustained prior to this date.[4]  Their request will be denied.

For statute of limitations purposes, a claim accrues in a property damage action "when

---

[4] Plaintiffs also spend much time pressing use of the continuing trespass doctrine.  When a party alleges a continuing trespass, it is permitted to recover for damages incurred in the two-year statutory period preceding the suit, even if the original trespass upon which the action is based occurred outside the limitations period.  *Kowalski v. TOA PA V, L.P.*, 206 A.3d 1148, 1167-68 (Pa. Super. 2019). This Court previously held in Plaintiffs' favor on this issue, finding that Plaintiffs alleged a continuing trespass.  *See Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp.3d 115, 127 (E.D. Pa. 2019).  It is unclear why Plaintiffs raise the doctrine again here, given that Columbia's moving brief does not raise the issue and, indeed, only questions Plaintiffs' ability to recover damages sustained prior to April 5, 2016—the same date from which Plaintiffs could recover damages pursuant to the continuing trespass doctrine.  *See Kowalski*, 206 A.3d at 1167; *Marcum*, 423 F. Supp.3d at 127 ("Plaintiffs thus can potentially recover for damages in the two-year statutory period preceding the suit.").  In its reply brief, Columbia asserts that the continuing trespass doctrine does not apply and further argues that "all of Plaintiffs' claims for damages in this matter should be dismissed as time-barred."  Courts need not address arguments raised for the first time in a reply brief.  *See Gucciardi v. Bonide Prods., Inc.*, 28 F. Supp.3d 383, 393 (E.D. Pa. 2014) ("Where a reply brief raises new arguments in support of a motion for summary judgment, the district court is justified in disregarding them.").  Columbia's moving brief only questions Plaintiffs' ability to "recover[] for damages sustained prior to April 5, 2016," and this is the only timeliness argument that will be considered.

the injury occurred or was discovered." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014).

Pursuant to Pennsylvania's discovery rule, "the statute of limitations begins to run when the

complaining party 'knows, or reasonably should know (1) that he has been injured, and (2) that

his injury has been caused by another party's conduct.'" *Miller v. Phila. Geriatric Ctr.*, 463 F.3d

266, 276 (3d Cir. 2006) (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)). Here, the

record establishes that Plaintiffs were aware of the damages they sustained during the 2015

construction of the 1278 line—namely, the July 2015 incident where heavy rain caused

sediment-laden runoff to deposit on Plaintiffs' patio and yard and the August 2015 incident

where heavy rain caused washout of the restored easement area—when they occurred. Plaintiffs

documented both events that summer, taking photographs and videos of the damage, the failed

E&S controls, and Columbia's cleanup efforts.

In November 2015, Plaintiff Scott Marcum contacted Columbia's agents to inform them

of enhanced stormwater runoff. At that time, Plaintiff expressly complained that this increase

was due to Columbia's removal of the water diversion berm on Plaintiffs' property. Columbia's

construction manager visited the property the following month, investigated the easement, and

told Plaintiff that he saw "an issue with the grade." In mid-December, Plaintiff informed

Columbia that he was contemplating bringing suit.

The question of when an injury is discovered for statute of limitations purposes is

ordinarily one for the jury. *Gleason v. Borough of Moosic*, 15 A.3d 479, 485 (Pa. 2011). But

where the salient facts are not in dispute, the court is permitted to determine whether the

discovery rule applies. *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) ("Where, however,

reasonable minds would not differ in finding that a party knew or should have known on the

exercise of reasonable diligence of his injury and its cause, . . . the discovery rule does not apply

as a matter of law.").  Here, Plaintiffs documented their injuries as they occurred and, in 2015, expressly informed Columbia of the very same water diversion concerns at issue in this litigation.  With respect to damages incurred prior to April 5, 2016, no fact finder could reasonably conclude that Plaintiffs were unaware of these damages or their cause.

Plaintiffs' only response to the contrary concerns their statutory SWMA claim.  They argue that they could not have reasonably discovered the extent of Columbia's alleged SWMA violation until discovery in this action.  But Plaintiffs' ignorance of a legal cause of action does not, in itself, require application of the discovery rule.  Once a plaintiff "possesses the salient facts concerning the occurrence of his injury and who or what caused it, he has the ability to investigate and pursue his claim.  Postponing the commencement of the limitations period until he has actually done so would nullify the justifiable rationale of the statute of limitations[.]"  *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704, 710 (3d Cir. 1981).  Thus, Plaintiffs may not recover for damages incurred prior to April 5, 2016, but remain entitled to seek recovery for damages sustained after this date.  *See Robinson v. Pa. Hosp.*, 737 A.2d 291, 294 (Pa. Super. 1999) ("Should new injuries appear from the original harm, no statute of limitations would bar a subsequent suit for recovery.").

### 3.  The SWMA Claim

Section 13 of Pennsylvania's SWMA requires "[a]ny landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics" to:

> implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property.  Such measures shall include such actions as are required:
>
> (1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or
>
> (2) to manage the quantity, velocity and direction of resulting storm water runoff

13

> in a manner which otherwise adequately protects health and property from possible injury.

32 Pa. Stat. Ann. § 680.13.  Plaintiffs allege that Columbia violated—and continues to violate—this statute by failing to comply with two municipal ordinances: (1) Caln Township Ordinance Section 88-3, which requires "any person engaging in activities which disturb the topography and vegetation of land" within the township to first secure a grading permit; and, (2) Caln Township Ordinance Section 135-105(B), which, like the SWMA, requires persons "engaged in the alteration or development of land" to "manage the rate, volume, direction, and quality of resulting stormwater runoff in a manner which otherwise adequately protects health, property, and water quality of waters of the commonwealth."

Columbia argues that this claim must be dismissed, for two reasons.  First, it contends that the municipal ordinances upon which Plaintiffs premise their SWMA claim are preempted by the FERC order approving the 1278 line.  Second, it argues that Plaintiffs fail to provide evidence that Columbia violated the terms of a "county-adopted watershed storm plan" as required to state their SWMA claim.  *See Lincoln Investors, L.P. v. King*, 152 A.3d 382, 390 (Pa. Commw. 2016).

The preemption argument is dealt with first.  Although Columbia suggests that the municipal ordinances cited by Plaintiffs are "preempted by FERC," it appears what Columbia means is that these ordinances are preempted by the Natural Gas Act, which "confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988).  Columbia transports and sells natural gas in interstate commerce and is a "natural gas company" subject to FERC regulation under the Act.  *See* 15 U.S.C. § 717a(6).  The Act requires natural gas companies to obtain from FERC a "certificate of public convenience and necessity" prior to

14

constructing or operating facilities used for the interstate transportation of natural gas.  *See id.* § 717f(c).

Columbia obtained such a certificate before beginning work on the 1278 line.  It maintains that it was not required to obtain an additional township grading permit or comply with the township's stormwater management ordinances, as neither requirement was mandated in the FERC order approving construction of the 1278 line.  Plaintiffs offer no specific response to Columbia's argument that it was not required to obtain a township grading permit prior to installing the pipeline, effectively conceding this point.  *See Skirpan v. Pinnacle Health Hosps.*, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) (party waives issues unaddressed in its response to summary judgment motion).  They do, however, contend that Columbia cannot hide behind the Natural Gas Act to escape post-construction liability for violations of state and local stormwater management provisions.

Federal law is, under the Supremacy Clause, "the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.  Thus, Congress may preempt state laws through federal legislation.  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).  It may do so expressly or implicitly.  *Id.* at 376-77.  Where, as here, a statute contains no explicit preemption language, Congress may implicitly preempt state action through "field" or "conflict" preemption.  *Id.* at 377.

Field preemption exists where Congress "intended 'to foreclose any state regulation in the *area*,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'"  *Id.* (quoting *Arizona v. United States*, 576 U.S. 387, 401 (2012)).  "In such situations, Congress has forbidden the State to take action in the *field* that the federal statute pre-empts."  *Id.*  Conflict preemption, on the other hand, "exists where 'compliance with both state and federal law is impossible,'" *id.* (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)), or where the

state law "stands as an obstacle to the accomplishment and execution" of the federal law, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Columbia does not specify which form of implied preemption it believes to be at issue here. The United States Supreme Court has found FERC's regulatory authority under the Natural Gas Act to be field preemptive where a state law "amounts to a regulation in the field of gas transportation and sales for resale that Congress intended FERC to occupy." *Schneidewind*, 485 U.S. at 304. Thus, in *Schneidewind*, a state law requiring natural gas companies to obtain state approval before issuing long-term securities was preempted by the Natural Gas Act, because the law was "directed at . . . the control of rates and facilities of natural gas companies," "precisely the things over which FERC has comprehensive authority." *Id.* at 308.

In a later case, the Court clarified that the Natural Gas Act was not intended to limit the regulatory power of the states, but rather "was drawn with meticulous regard for the continued exercise of state power." *Oneok*, 575 U.S. at 385-86 (quoting *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 517-18 (1947)); *see id.* at 387 (Natural Gas Act was not intended to preempt "traditional" state regulation). Considering whether the Natural Gas Act field preempts state antitrust law as applied to natural gas companies, the Court emphasized "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Id.* at 385. Where a law is not "aimed at natural-gas companies in particular, but rather all businesses in the marketplace," it will not be field preempted, *id.* at 387, although conflict preemption principles may still apply, *id.* at 389. Because the state laws at issue were aimed primarily at the field of antitrust enforcement, rather than at natural gas regulation, the Court found that these laws were not field preempted.

Here, the state and local stormwater management laws cited by Plaintiffs do not target the natural gas industry, but rather apply broadly to "[a]ny landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics." *See* 32 Pa. Stat. Ann. § 680.13. They are, moreover, directed at protecting "health and property from possible injury," *see id.*, a subject traditionally left to the States to regulate, *see Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934) (states have inherent "authority to safeguard the vital interests of [their] people"). The Natural Gas Act does not field preempt these laws.

So, the only remaining question is whether these stormwater management provisions are conflict preempted. Courts regularly apply conflict preemption to state and local actions which serve to prohibit or unreasonably delay the construction of pipeline facilities approved by FERC. *See, e.g.*, *PennEast Pipeline Co. v. Permanent Easement of 0.06 Acres in Moore Twp., Northhampton Cty., Pa.*, 2019 WL 4447981, at *8 (E.D. Pa. Sept. 17, 2019) ("[S]tate and local regulation is preempted by the NGA to the extent they conflict with federal regulation or would delay the construction and operation of facilities approved by [FERC]."); *Algonquin Gas Transmission, LLC v. Weymouth, Ma.*, 919 F.3d 54, 63-65 (1st Cir. 2019) (town's denial of a permit for a natural gas compressor station pursuant to a local wetlands ordinance conflicted with FERC project approval); *Islander E. Pipeline Co., LLC v. Blumenthal*, 478 F. Supp.2d 289, 294-95 (D. Conn. 2007) (requirement that natural gas company obtain a state permit prior to constructing pipeline conflicted with FERC project approval). But this case is distinguishable. The 1278 line has already been installed and is operational; thus, the core concern of these conflict preemption cases—namely, that application of state law will obstruct Congress's purposes in enacting the Natural Gas Act and empowering FERC with the authority to facilitate the interstate transmission of natural gas—is not in play.

At heart, Plaintiffs' Complaint seeks damages for injuries caused by Columbia's alleged failure to comply with the provisions of the SWMA.  Columbia fails to identify how this action for damages implicates FERC's authority under the Natural Gas Act to regulate the transportation of natural gas, *see, e.g.*, *Abramson v. Fla. Gas Transmission Co.*, 909 F. Supp. 410, 416-17 (Nov. 20, 1995) (state tort law does not conflict with federal regulation of transportation and sale of natural gas), and fails to identify any authority finding preemption under similar circumstances.  Accordingly, the Court declines to find the stormwater management laws relied on by Plaintiffs preempted by the Natural Gas Act.

Columbia next argues that Plaintiffs' allegations and evidence fail to support their SWMA claim.  The contention is two-pronged:  First, Columbia notes that to state a claim under section 13 of the SWMA, Plaintiffs must make "a showing that the landowner's conduct violated the terms of a county-adopted watershed storm water plan."  *See Marcum*, 423 F. Supp.3d at 125 (quoting *Lincoln*, 152 A.3d at 390).  The parties agree that the relevant "county-adopted watershed storm water plan" is Chester County's Act 167 Stormwater Management Plan. Columbia argues that Plaintiffs fail to establish which terms of the Plan it is alleged to have violated.

This first argument is quickly put to bed.  Plaintiffs argue that Columbia violated section 135-105 of the Caln Township Stormwater Management Ordinance, which adopts in its entirety Section 105(B) of Act 167's Stormwater Management Model Ordinance:

> [A]ny landowner or any person engaged in a regulated activity, including but not limited to the alteration or development of land, which may affect stormwater runoff characteristics, shall implement such measures as are reasonably necessary to prevent injury to health, safety, or other property.  Such measures also shall include actions as are required to manage the rate, volume, direction, and quality of resulting stormwater runoff in a manner which otherwise adequately protects health, property, and water quality of waters of the commonwealth.

18

The township was required, pursuant to the SWMA, to adopt this provision. *See* 32 Pa. Stat. Ann. § 680.11 ("Within six months following adoption and approval of the watershed storm water plan, each municipality shall adopt or amend, and shall implement such ordinances and regulations . . . as are necessary to regulate development within the municipality in a manner consistent with the applicable watershed storm water plan and the provisions of this act."). Plaintiffs adequately identify which terms of Act 167 it believes Columbia to have violated.

Second, Columbia argues that it cannot be liable under the SWMA, because it complied with all of the Act 167 requirements necessary to obtain the state permits required by FERC. It is undisputed that Columbia's plans and submissions for the issuance of the required permits were reviewed by both the Chester County Conservation District and the Pennsylvania Department of Environmental Protection ("PADEP") and were found to be in conformance with Act 167. It is also undisputed that the PADEP issued Columbia an ESCGP-2 permit, allowing it to proceed with the 1278 pipeline project. But Columbia fails to clarify how these facts bear on its alleged liability under section 13 of the SWMA. Pursuant to that section, a landowner must, when altering or developing land, "manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury." *Id.* § 680.13. The Act provides a civil remedy in damages for persons "injured by conduct which violates the provisions of section 13." *Id.* § 680.15(c). Columbia points to no statutory safe harbor provision insulating a landowner from liability for injuries caused by increased stormwater runoff if it obtains the requisite permits prior to engaging in land alteration.

Plaintiffs offer enough evidence from which a factfinder could conclude that Columbia's land alteration activities resulted in enhanced stormwater runoff, which has in turn damaged Plaintiffs' property. Whether Columbia's stormwater management efforts were sufficient to

avoid SWMA liability is now a question for a jury if this matter proceeds to trial.

### 4.  The Nuisance and Trespass Claims

Columbia also challenges Plaintiffs' nuisance and trespass claims.  Because Columbia

fails to identify a basis for granting summary judgment as to either claim, both will survive.

As to the nuisance claim, Columbia suggests that Plaintiffs premise this claim on

Columbia's "fail[ure] to comply with § 680.13 of the Pennsylvania Storm Water Management

Act" and should therefore be dismissed for the same reasons as the SWMA claim.  Columbia

misreads Plaintiffs' Complaint.  Although Plaintiffs' nuisance allegations do, like their SWMA

allegations, fault Columbia for failing to "(1) assure that the maximum rate of storm water runoff

is no greater after development than prior to development activities, and (2) manage the quantity,

velocity and direction of resulting storm water runoff in a manner which otherwise adequately

protects plaintiffs' property," these allegations do not suggest that Plaintiffs' nuisance claim is

premised on their SWMA claim.  Columbia fails, moreover, to provide any legal analysis or

citation specific as to why summary judgment should be granted on Plaintiffs' nuisance claim.

See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp., 26 F.3d 375,

398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those

purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this

court.'" (alteration in original) (quoting Simmons v. City of Philadelphia, 947 F.2d 1043, 1066

(3d Cir. 1991))).

Columbia's briefing on Plaintiffs' trespass claim is similarly sparse.  Indeed, Columbia

fails to make any argument at all as to the adequacy of Plaintiffs' trespass allegations and

evidence.  Although Plaintiffs will bear the burden of proving these claims at trial, Columbia—as

the moving party—bears the initial burden of showing the basis for its summary judgment

motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This requires Columbia to do more

than merely state that Plaintiffs' nuisance and trespass claims should be dismissed; it must

provide some ground for dismissal.  It fails to do so.  Ergo, these two claims will proceed.

### 5.  *The Breach of Fiduciary Duty Claim*

The same cannot be said for Plaintiffs' breach of fiduciary duty claim.

To establish a breach of fiduciary duty, Plaintiffs must show: (1) the existence of a

fiduciary relationship; (2) the defendant's failure to act in good faith and solely for the benefit of

the plaintiff with respect to matters within the scope of that relationship; (3) that the plaintiff

suffered an injury; and, (4) that defendant's failure to act was a "real factor" in producing the

plaintiff's injury.  *Conquest v. WMC Mortg. Corp.*, 247 F. Supp.3d 618, 633-34 (E.D. Pa. 2017)

(quoting *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003)).  Columbia questions

only the first requirement, arguing that Plaintiffs fail to allege or produce evidence of a fiduciary

relationship between the parties.

"A fiduciary duty is the highest duty implied by law."  *Yenchi v. Ameriprise Fin., Inc.*,

161 A.3d 811, 819 (Pa. 2017).  It "requires a party to act with the utmost good faith in furthering

and advancing the other person's interests."  *Id.* at 820.  Given the significance of this obligation,

a fiduciary duty must be imposed only "where the attendant conditions make it certain that a

fiduciary relationship exists."  *Id.*

Fiduciary relationships rarely arise in the context of arms-length transactions.  *See id.* at

822-23.  This is how Columbia characterizes its relationship with Plaintiffs:  It argues that the

parties' negotiation and execution of the 2014 Amendment was a "routine, arms-length business

transaction" which took place over a period of 18 months, during which time Plaintiffs had

ample opportunity to and did in fact consult with counsel.  It notes that Plaintiffs voluntarily

21

entered into the 2014 Amendment and received a negotiated sum of $35,000 in exchange.

To Plaintiffs, the parties' transaction was anything but "routine." They note that a fiduciary relationship may arise "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Id.* at 820. Such was the case here, they say: Although Plaintiffs negotiated for compensation of $35,000, they never had the option to refuse to grant an easement in light of Columbia's condemnation powers and were forced to contract on Columbia's terms.

Given the disparity in bargaining power between the parties, their execution of the 2014 Amendment cannot fairly be characterized as a "routine" business transaction. But neither can Columbia's substantial bargaining power be a basis for imposing a fiduciary duty. This power was bestowed by Congress pursuant to the Natural Gas Act, which authorizes gas companies like Columbia to acquire property by eminent domain if: (1) the company holds a certificate of public convenience and necessity from FERC; (2) it is unable to acquire the easement via negotiation with the landowner; and, (3) the landowner seeks an amount greater than $3,000. *See Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Twp., Lancaster Cty., Pa., Tax Parcel No. 1201606900000*, 907 F.3d 725, 729 (3d Cir. 2018) (citing 15 U.S.C. § 717f(h)). Plaintiffs point to no language in the Act imposing on gas companies a corresponding duty to act solely for the benefit of the landowners whose property they condemn or otherwise obtain. Nor does the language of the 2014 Amendment create such a duty: It merely defines the parties' rights with respect to the easement area.

Plaintiffs fail, moreover, to provide any authority imposing a fiduciary relationship under similar circumstances. Their reliance on *Adair v. EQT Production Co.*, 2011 WL 4527433

(W.D. Va. Jan. 21, 2011), is misplaced.  That case did not involve the installation of natural gas pipelines, but rather the drilling and production of coal bed methane ("CBM"), a natural gas residing in coal seams.  CBM was long considered a waste product until innovations in extraction technologies allowed for its commercial capture and sale.  *Id.* at *1.  Given its newfound value, a question arose as to whether CBM was owned by landowners who retained rights to the gas estate/interest in the land, or by the entities or individuals who owned the coal estate/interest.  *Id.*  To avoid having ownership disputes slow the development of CBM, Virginia enacted a compulsory pooling statute, whereby all interests or estates would be pooled into CBM drilling units.  *Id.*  Pursuant to the statute, gas well operators would be appointed to drill for and produce CBM from the drilling units.  *Id.*  In drilling units where there were conflicting claims of CBM ownership or where the owners could not be found, the statute required unit operators to "deposit any funds due to these interests into escrow, to be held pending identification and location of the owner or a final agreement or determination as to ownership of the CBM estate/interest."  *Id.*

The question presented to the *Adair* court was whether unit operators owe a fiduciary duty to properly account for and pay into escrow the funds due to potential CBM owners.  That court said yes, recognizing that absent such a duty, the mineral interest owner would have "no assurance of ever receiving any benefit of their bargain."  *Id.* at *25.  This situation is factually distinct from the present matter:  Under Virginia's compulsory pooling statute, unit operators are placed in charge of funds due to potential CBM owners, putting the operators in a position similar to that of a trustee.  *See Hale v. CNX Gas Co.*, 2011 WL 4527447, at *26 (W.D. Va. Jan. 21, 2011).  No similar statutory requirement exists here.

Plaintiffs also rely on Pennsylvania's Environmental Rights Amendment, Pa. Const. art.

I, § 27, as a basis for finding a fiduciary relationship.  This constitutional provision expressly names the Commonwealth as "trustee" of Pennsylvania's public natural resources and imposes on it a fiduciary duty "to 'conserve and maintain' the corpus of the trust."  *Pa. Envt'l Def. Found. v. Commonwealth*, 161 A.3d 911, 932 (Pa. 2017) (quoting *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 957 (Pa. 2013)).  Plaintiffs fail to clarify how this provision's imposition of a fiduciary duty upon the Commonwealth to act in the best interest of its citizens with respect to public natural resources bears on Plaintiffs' request for imposition of a fiduciary duty on Columbia to act in the best interest of Plaintiffs with respect to their personal property. Plaintiffs cite to no authority—constitutional, statutory, or otherwise—supporting the imposition of a fiduciary duty between a natural gas company and a landowner when the former obtains an easement from the latter for the installation of a gas pipeline.  Thus, their breach of fiduciary duty claim will be dismissed.

### 6.  The Negligent Construction and Failure to Maintain Claim

Finally, Columbia seeks dismissal of Plaintiffs' negligence claim.  To succeed on this claim, Plaintiffs must establish that: (1) Columbia owed Plaintiffs a duty of care; (2) Columbia breached this duty; and, (3) the breach resulted in injury.  *McCandless v. Edwards*, 908 A.2d 900, 904 (Pa. Super. 2006).  Columbia contends that Plaintiffs fail to produce evidence suggesting that it breached its duty of care.  Specifically, it argues that the applicable duty of care was set forth by the requirements of FERC relative to the construction of the pipeline.  Because, says Columbia, there is no evidence that any FERC regulations were violated, its conduct with respect to the easement area could not have been negligent.

Again, Columbia fails to cite relevant authority in support of its position.  But it does note that:

24

the determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury.  It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence.

*Snead v. Soc'y for Prevention of Cruelty to Animals of Pa.*, 929 A.2d 1169, 1183 (Pa. Super. 2007) (citations omitted).  Here, Plaintiffs present evidence from which a jury could conclude that various water diversion features were removed from Plaintiffs' property during construction of the 1278 line.  There is evidence indicating that Columbia's construction manager saw an issue with the property grading following installation.  There is no indication that Columbia ever attempted to address this issue.  Plaintiffs have documented water-related damage to their property including land-subsidence problems, which their expert attributes to accelerating surface and subsurface erosion.[5]  From this evidence, a reasonable jury could find that the amount of water runoff on Plaintiffs' property has increased since the installation of the 1278 line, and that Columbia was negligent in failing to implement adequate stormwater management measures.

So, the negligence claim will proceed, along with the nuisance, trespass, and SWMA claims, limited by the timeliness concerns addressed above.  An appropriate order follows.

**July 19, 2021**                                                   **BY THE COURT:**

                                                                   **/s/Wendy Beetlestone, J.**

                                                                   _____

                                                                   **WENDY BEETLESTONE, J.**

---

[5] Columbia takes issue with the inability of Plaintiffs' expert to state with certainty whether the sinkhole which began to develop on Plaintiffs' property in February 2018 was due to the presence of soluble limestone in the sinkhole area or Columbia's reliance on poor backfilling methods when constructing the 1278 line.  Columbia may seek to explore this issue during cross-examination, *see Kannankeril*, 128 F.3d at 806, but it is not dispositive to the present motion.  Plaintiffs' primary contention is that this and their other water-related injuries were caused by enhanced stormwater runoff, which in turn was caused by Columbia's ongoing failure to install adequate stormwater controls.