## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT R. MARCUM AND KERSTIN MARCUM,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO.  19-3873** |
| **COLUMBIA GAS TRANSMISSION, LLC.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff homeowners Scott and Kerstin Marcum brought claims for negligent construction and failure to maintain, violation of the Pennsylvania Storm Water Management Act ("SWMA"), nuisance, and trespass to land by alteration of surface and subsurface drainage[1] against Defendant Columbia Gas Transmission, LLC ("Columbia") related to the construction of a natural gas pipeline through their property.  The Marcums claimed that Columbia's removal of stormwater management controls during and failure to properly install new controls after construction led to increased stormwater runoff that caused damage to the property, including flooding and sinkholes.  Following a six-day trial, the jury returned a verdict in the Marcums' favor on all claims and awarded $850,000 in damages.  Columbia filed timely[2] motions for (1) judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and (2) a new trial pursuant to Rule 59(a), or in the alternative remittitur pursuant to Rule 59(e).

---

[1] Although the jury found Columbia liable on each of these claims, Columbia's post-trial motions only challenge the finding of SWMA liability.

[2] Motions under Rule 50(b) and Rule 59 must be filed "no later than 28 days after the entry of judgment."  An order entering judgment following the jury's verdict was signed by the Court on June 28, 2022 and docketed on June 29, 2022.  Columbia's deadlines for post-trial motions began to run on the latter date.  *United States v. Fiorelli*, 337 F.3d 282, 287 (3d Cir. 2003) ("[A]lthough an order may be signed by the district court, received by the clerk, and entered in the docket on different days, the entry date controls.").

## I.      BACKGROUND

Plaintiffs Scott and Kerstin Marcum purchased their home in 1998 subject to an easement granting Columbia's predecessor the right to install and operate a natural gas pipeline through the property.  In 2014, Columbia amended its Right of Way Agreement with the Marcums to allow the installation, operation, and maintenance of a new pipeline, referred to as "the 1278 line."  Columbia subsequently sought and received authorization to construct the pipeline from the Federal Energy Regulatory Commission ("FERC"), and installed the pipeline through the Marcums' property in the summer of 2015.

At trial, the Marcums presented evidence that during and after construction, Columbia's removal or improper installation of water diversion features caused an increase in stormwater runoff that damaged their home.  Specifically, the Marcums claimed that a "diversion berm" or "water bar" was installed on their property prior to the 2015 construction, but removed by Columbia and not replaced.  According to the Marcums, the water bar channeled runoff towards the property line, and away from their home.  The Marcums' expert witness, Chad Ingram, testified that the water bar was visible on topographical maps of the property prior to 2015, but no longer appeared after the 1278 line's construction.  Columbia's expert, Patrick Fox, disputed that pre-2015 maps showed a water bar.

Although the parties disagreed about the pre-construction existence of the water bar on the Marcums' property, they did agree that three diversion berms installed on the property of the Marcums' upslope neighbor were removed and reinstalled during construction of the 1278 line. However, Ingram testified that Columbia undercut the efficacy of the berms by clearing trees and undergrowth during construction.  According to Ingram, the cleared areas increased stormwater runoff, and logs stacked at the edge of the Marcums' property diverted runoff back towards the

house, rather than allowing it to divert into the woods.  According to Fox, runoff was channeled toward the Marcums' house not because of Columbia's actions, but instead due to the property's downslope location and a "swale" (a depression) in the backyard located outside of the pipeline easement.

The Marcums testified and offered video and photographic evidence that their property experienced increased runoff after storms, and that this runoff flooded their basement, left sediment deposits in their yard and patio, and created sinkholes in 2018 and 2020.  Fox disputed the severity of this damage, testifying that his inspection of the house revealed no damage to its foundation.  He also noted that the 2018 sinkhole had been repaired, and disagreed with the Marcums' observations that new sinkholes had subsequently formed.  The jury resolved this conflicting evidence in the Marcums' favor and awarded them $850,000 in damages.  Columbia then filed these motions, arguing the verdict should be set aside or reduced for the various reasons discussed below.

## II.    MOTION FOR JUDGMENT AS A MATTER OF LAW

Columbia argues that it is entitled to judgment as a matter of law on the Marcums' SWMA claims for two reasons: (1) the state and local provisions underlying the claims are preempted by the federal Natural Gas Act; and (2) the Marcums failed to present sufficient evidence at trial that an SWMA violation occurred.  Judgment as a matter of law is not warranted on either basis.

### A.  Legal Standard

On the renewed motion of a party, Rule 50(b) allows the trial court to enter judgment as a matter of law at the conclusion of a jury trial notwithstanding a jury verdict for the opposing party, but "only if, as a matter of law, the record is critically deficient of that minimum quantity

of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001). This is a "sparingly invoked remedy." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

A court may grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *LePage's, Inc. v. 3M*, 324 F.3d 141, 145-46 (3d Cir. 2003) (citation and internal quotation marks omitted). "The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury," but rather may grant a Rule 50 motion only "if upon review of the record it can be said as a matter of law that the verdict is not supported by legally sufficient evidence." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691-92 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003); *see also LePage's*, 324 F.3d at 145-46 ("[R]eview of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict."). For this reason, "[n]ormally, when the evidence is contradictory, [judgment as a matter of law] is inappropriate." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 811 (3d Cir. 1984).

## B. Preemption

Columbia's first argument—that the SWMA and related local stormwater management provisions are preempted by federal law—was not raised in its motions for judgment as a matter of law under Rule 50(a), and is therefore not properly before the Court. *See Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 220 (3d Cir. 2021) ("[A] post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case.");

Fed. R. Civ. P. 50(b) advisory committee's note to 1991 amendment ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." (citing *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989))).  Columbia made two motions for judgment as a matter of law under Rule 50(a)[3] during trial, once at the close of Plaintiffs' case-in-chief and again at the close of its own, but did not raise preemption in either. In these motions, Columbia argued only that it was entitled to judgment as a matter of law because the Marcums failed to present evidence sufficient to establish an SWMA violation (the second argument it raises now).  Columbia cannot make a "renewed" motion under Rule 50(b) in support of an argument that was never raised under Rule 50(a).

    Although not raised in a Rule 50(a) motion as required, the same preemption argument Columbia makes now was raised and ruled on nearly a year earlier at the summary judgment stage.  Columbia's motion might therefore be better characterized as a belated motion for reconsideration of the Court's denial of summary judgment.[4]  But even if Columbia's preemption argument had been timely raised in a motion for reconsideration, it would still be unsuccessful.  Reconsideration is warranted if a party shows "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *see also Pollock v. Energy Corp. of Am.*, 665 F. App'x 212, 218 (3d Cir. 2016) (A motion for reconsideration "is not properly founded on a request that the Court

---

[3] "Rule 50(a) provides for a motion for judgment as a matter of law. . . . This procedure formerly was known as the motion for a directed verdict."  9B Arthur R. Miller, *Federal Practice & Procedure Civil* § 2521 (3d ed. 2022).

[4] In a footnote primarily focused on the procedural requirements for appealing the denial of summary judgment based on purely legal issues, Columbia states that it "raises its preemption argument again to give this Court another opportunity to consider the issue."

rethink what it had already thought through—rightly or wrongly." (cleaned up)); *Dodge v. Susquehanna Univ.*, 796 F. Supp. 829, 830 (M.D. Pa. 1992) ("[A]ny litigant considering bringing a motion to reconsider . . . should evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant."). Columbia has not so shown; instead, it simply reargues the same position rejected at summary judgment without pointing to new evidence, new law, or anything other than continuing disagreement with the Court's decision.[5]

## C. Sufficiency of the Evidence

Columbia's second argument for judgment as a matter of law is that the Marcums failed to present sufficient evidence for a reasonable jury to conclude that it violated the SWMA.

---

[5] In addition to its procedural deficiencies, Columbia's argument remains substantively unconvincing. Columbia concedes that it must make its argument under a conflict preemption theory, which requires showing that compliance with state and local stormwater management regulations would have "prohibit[ed] or unreasonably delay[ed]" construction of the FERC-approved 1278 pipeline. Here and at summary judgment, Columbia has failed to explain why the provisions it challenges would do so.

The clearest argument Columbia makes on this point is that compliance with the SWMA would have required obtaining permits from every Pennsylvania township the pipeline crossed. But, as discussed in Section II.C.ii *infra*, the crux of the Marcums' claims was not that Columbia constructed the pipeline without obtaining proper approvals, but rather that it violated the substantive duties imposed by the SWMA to adequately control stormwater runoff during and after construction. Moreover, while construction projects can be required to obtain township permits certifying that their stormwater management plans are in compliance with the SWMA, the Pennsylvania Department of Environmental Protection allowed Columbia to obtain approval through an alternate means, by submitting an "Act 167 Plan Verification Report" to the Chester County Conservation District.

Second, Columbia argues that the doctrine of conflict preemption limited its obligations to comply with state and local regulations to those FERC "specifically ordered" it to follow. Regardless of whether this is a correct characterization of conflict preemption as applied to the 1278 pipeline, the FERC approval process *did* require, or at least incorporate, compliance with state stormwater management regulations. *See* Order Issuing Certificate and Approving Abandonment, 149 FERC ¶ 61,255, at ¶ 33 (2014) ("[T]able 1.8-1 of the [Environmental Assessment] identifies applicable permits for Columbia's project. . . ."); FERC Off. of Energy Projects, *East Side Expansion Project Environmental Assessment* (Docket No. CP14-17-000) 1-23 to 1-24 (2014) (listing the Pennsylvania "Erosion & Sedimentation Control General Permit for Oil and Gas Activities (ESCGP-2)" among the applicable permits "identified by Columbia"). The ESCGP-2 Permit, which Columbia itself characterizes as "required by FERC," directed Columbia to prepare stormwater management plans consistent with the SWMA. And FERC left it to "the discretion of the Chester County Conservation District to determine whether Columbia has complied with the applicable requirements of the ESCGP-2 permit program." FERC Order, at ¶ 34.

Columbia asserts two bases for this argument: (1) "[t]he evidence presented at trial demonstrated that Columbia complied with all requirements of the Chester County Act 167 Plan necessary to obtain the required Pennsylvania Department of Environmental Protection ('PADEP') permits which were required by FERC"; and (2) the Marcums failed to offer "a calculated finding that there was an increase in the stormwater runoff as a result of" pipeline construction.

### i.   SMWA Statutory Framework

The Marcums brought their SWMA claim under Sections 13 and 15 of the statute. Section 13 requires "[a]ny landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics" to:

> implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property. Such measures shall include such actions as are required:
>
> (1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or
>
> (2) to manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury.

32 Pa. Cons. Stat. § 680.13. Section 15 provides a private right of action to "[a]ny person injured by conduct which violates the provisions of section 13." *Id.* § 680.15.

A Section 13 violation requires showing a violation of the stormwater management plan that each county must "prepare and adopt . . . for each watershed located in the county . . . in consultation with the municipalities located within each watershed." *Id.* § 680.5(a); *see Lincoln Investors, L.P. v. King*, 152 A.3d 382, 390 (Pa. Commw. 2016). Chester County's watershed plan applies here. As part of its stormwater management plan promulgated pursuant to the SWMA—also referred to as the "County-wide Act 167" Plan—Chester County developed a model stormwater management ordinance to be adopted by its municipalities. This model

ordinance establishes a floor for municipal stormwater regulation, allowing municipalities to "set more restrictive or stringent standards than those included herein, but they cannot be reduced or diminished."  Note 5 to Chester County, Pa. County-wide Act 167 Stormwater Management Model Ordinance (May 27, 2013).  The municipal ordinances adopted pursuant to the Chester County plan and applicable to the Marcums' claims were those of Caln Township, which enacted a version of the county model ordinance as the "Caln Township Stormwater Management Ordinance."  Caln Township, Pa., Code §§ 135-101 *et seq*.  The Marcums, therefore, premised their SWMA claims on violations of the county plan through violations of the Caln Township Stormwater Management Ordinance.  Specifically, the Marcums claimed that Columbia violated the SWMA by violating Section 105(B) of the Caln ordinance.[6]

### ii.  PADEP Permits

Columbia argues that because it successfully obtained certain state permits that required submitting pre-construction plans related to stormwater management, it could not have violated the SWMA.  Columbia's argument is unpersuasive for several reasons, most fundamentally because obtaining permits prior to beginning construction is a distinct issue from complying with the SWMA during and after construction.  Although the Marcums alleged at earlier stages in the litigation that Columbia's SWMA violations stemmed partially from a failure to obtain a Caln Township grading permit before beginning construction, the case presented at trial focused on Columbia's alleged failure to adequately control stormwater runoff to prevent damage to the Marcums' property.  In other words, the evidence presented focused on Columbia's failure to

---

[6] Initially, the Marcums also alleged that Columbia violated Section 88-3 of the Caln ordinance, which requires "any person engaging in activities which disturb the topography and vegetation of land" to first obtain a grading permit. However, at summary judgment, the Marcums made "no specific response to Columbia's argument that it was not required to obtain a township grading permit" under Section 88-3 and were deemed to have conceded this point. *Marcum v. Columbia Gas Transmission, LLC*, 549 F. Supp.3d 408, 422 (E.D. Pa. 2021).

satisfy a substantive duty imposed by the SWMA, not allegations that Columbia failed to follow the SWMA's procedural requirements and violated the Act by constructing the 1278 pipeline without proper authorizations.  Columbia's post-trial focus on permitting therefore leaves a critical point unaddressed—the SWMA violation claimed by the Marcums could have occurred even though the pipeline was properly authorized if the plans submitted to obtain permits were either (a) inadequate to properly control stormwater or (b) not adhered to.  Giving the Marcums the benefit of reasonable inferences in their favor, the evidence supported both conclusions.

First, the parties presented conflicting evidence on whether the permit obtained by Columbia in fact established that its stormwater management plans complied with the SWMA. The specific permit Columbia argues precludes SWMA liability is the "ESCGP-2"[7] permit issued by the Pennsylvania Department of Environmental Protection ("PADEP") and the Chester County Conservation District ("CCCD").  Among other requirements, the permit directed Columbia to prepare "postconstruction stormwater management plans" that were "consistent with any current Department authorized Act 167 [SWMA] Stormwater Management Plan which covers the area where the project is proposed."  So although ESCGP-2 permits issue pursuant to state laws other than the SWMA—they issue pursuant to PADEP's authority under Pennsylvania's Clean Streams Law, 35 Pa. Cons. Stat. § 691.1 *et seq.*, and the 2012 Oil and Gas Act, 58 Pa. Cons. Stat. §§ 3201-3274—Columbia argues that the permit conclusively establishes that its stormwater management plans complied with the SWMA.

The Marcums disagree, arguing that no conclusive determination was made by agencies at the state, county, or municipal level.  Domenic Rocco, director of PADEP's Regional Permit Coordination Office, testified that the ESCGP-2 permit involved a multi-level system of review.

---

[7] "Erosion and Sediment Control General Permit."

PADEP delegated the review of certain plans submitted as part of the permit application to local agencies, and therefore did not itself review the stormwater management plans for SWMA compliance.  The CCCD also did not review the plans for SWMA compliance.  Joseph Sofranko, a CCCD resource conservationist, testified that because the SWMA's stormwater management requirements operate through the county watershed plan, and the county watershed plan operates through versions of the county's Model Ordinance adopted by municipalities, review for SWMA compliance would typically occur at the municipal level.  State and county agencies instead reviewed Columbia's plans for compliance with Pennsylvania administrative regulations such as "Chapter 102" and "Chapter 105," which are promulgated under the Clean Streams Law and other non-SWMA statutes.

However, in Columbia's case, no municipal-level review to establish compliance with municipal ordinances, like Caln Township's, occurred either.  PADEP allows compliance with the SWMA, for purposes of the ESCGP-2 permit, to be shown in one of two ways: either (1) by obtaining a consistency letter from the relevant municipality verifying conformance, or (2) by submitting a verification report prepared and sealed by a professional engineer.  Columbia elected the latter, and submitted an "Act 167 Verification Report" prepared on its behalf by the engineering firm GAI Consultants.  Although PADEP and CCCD accepted the Verification Report and ultimately approved the permit, the Caln Township Engineer reviewed Columbia's plans at an earlier point in the permitting process and issued a letter finding that Columbia's plans were "not consistent" with the township ordinance.

Rocco testified that non-consistency with the township ordinance did not necessarily mean the plans were also not consistent with the SWMA, as township ordinances can impose more stringent requirements than those in the Model Ordinance.  However, trial testimony did

not clarify whether Columbia was only found "not consistent" with township provisions exceeding those in the Model Ordinance, and Sofranko also testified that the ESCGP-2 permit left unresolved whether Columbia would fully comply with the SWMA.  The jury could have reasonably concluded from his testimony, combined with the non-consistency letter, that Columbia's stormwater management plans did not fully address the SWMA's requirements, despite the issuance of the ESCGP-2 permit.

Second, even if Columbia's permits did establish that the stormwater management plans it submitted before beginning construction complied with the SWMA, the measures it implemented in practice still could have violated the Act.  As an initial matter, it is not clear that liability under the SWMA must be determined in reference to permits.  Measuring adherence to permits can guide Pennsylvania regulatory agencies' determinations of SWMA compliance.  *See St. Paul Fire & Marine Ins. Co. v. Nolen Grp., Inc.*, 2007 WL 2571524, at *27 (E.D. Pa. Aug. 31, 2007) ("[A township engineer] testified at trial that approved permits and construction plans are the standard by which contractors and subcontractors are ultimately judged to be in compliance with the SWMA, because the permits and plans must be in conformity with the local ordinances that, in turn, are adopted pursuant to the watershed management plan.").  However, Columbia has not identified anything in the SWMA's text or in the cases interpreting it that limits private lawsuits under Section 15 to the same parameters that would guide an agency's compliance review.

Moreover, even agency review is not strictly confined to assessing only whether a regulated person or entity is following the initial plans submitted to obtain permits.  Sofranko testified that permitted entities may be required to add controls beyond those included in their initial plans during construction because although "plans on paper" may seem sufficient at the

project approval stage, they sometimes "just don't hold up" under real-world conditions.  In those instances, compliance requires implementing "additional controls and additional measures."  The erosion and sediment control plans that Columbia submitted, and which it points to as relevant to the question of SWMA compliance, themselves include the caveat: "If it is found that E&S [erosion and sediment] controls on this plan are insufficient or missing, additional E&S controls that are properly sized are to be installed under the direction of the Environmental Inspector and the Chester County Conservation District Inspector."

Additionally, Columbia's narrowly framed argument that it could not have violated the SWMA because it obtained permits skirts around another issue—did Columbia actually adhere to its permits?  Even if Columbia's SWMA liability can only be determined in reference to its permits, Sofranko testified that at least one routine inspection revealed permit violations. Sofranko was not reviewing for SWMA compliance, and therefore assessed these as violations "of 23 Pa. Code Chapters 92a and/or 102 and the Clean Streams Law, . . . 35 P.S. §691.1 *et seq.*" However, these violations revealed construction conditions relevant to the Marcums' claims, including the improper installation of a silt fence leading to erosion and the concentration of stormwater, and the use of inadequate quantities of straw mulch to protect against stormwater flows.  From this evidence, combined with the Marcums' evidence regarding the removal or improper reinstallation of water diversion features, the jury could have reasonably concluded that Columbia violated the SWMA despite obtaining certain permits before beginning construction.

### iii.  Calculated Finding of Stormwater Increase

Columbia also argues that the jury's verdict should be set aside because the SWMA requires a "calculated finding" quantifying the increase in stormwater runoff, and the Marcums failed to present one at trial.  Columbia cites no law in support of this assertion, and

Pennsylvania courts have declined to read such a requirement into SWMA's text.  *See Cogan House Twp. v. Lenhart*, 197 A.3d 1264, 1268-69 (Pa. Commw. 2018); *Glencannon Homes Assoc., Inc. v. N. Strabane Twp.*, 116 A.3d 706, 720-21 (Pa. Commw. 2015).

In *Glencannon Homes Association, Inc.*, the Pennsylvania Commonwealth Court rejected a similar post-verdict argument by unsuccessful defendants.  The *Glencannon* defendants challenged testimony by a plaintiff's expert that the defendants' actions increased stormwater runoff based on the "common sense that when you take grass away and you put in asphalt, the runoff is more."  *Id.* at 711.  The expert did not "calculate the amount of runoff both pre- and post-construction."  *Id.*  The trial court held, and the Commonwealth Court affirmed, that this testimony "met the [plaintiff's] burden of proving that the [defendants] did not adequately manage the stormwater runoff."  *Id.* at 714, 720-21.  This conclusion stemmed from the text of Section 13, which "requires a developing landowner to take such measures to assure that the rate of stormwater is not greater after development *or* to manage this stormwater management in such a manner that protects health and property from possible injury."  *Id.* at 720-21 (emphasis in original).

Columbia's argument is based on a challenge to the Marcums' expert, Scott Ingram, similar to the one raised by the *Glencannon* defendants.  Ingram testified that changes to the Marcums' backyard during construction, including those outlined previously, increased both the quantity and velocity of stormwater runoff on the property by "nearly double."  As Columbia notes, Ingram did not calculate and compare pre- and post-construction stormwater levels but instead based his testimony on an assessment of how changed topographical conditions in the backyard affected runoff.  Under *Glencannon*, this is sufficient to carry the Marcums' burden.

Furthermore, in *Lenhart*, the Commonwealth Court emphasized that because Section 13 applies to landowners and persons "engaged in the alteration or development of land which *may* affect stormwater runoff characteristics," 32 Pa. Cons. Stat. § 680.13 (emphasis added), liability stems from "a duty to implement measures to *prevent* injury from changes in runoff that *may or may not* occur." 197 A.3d at 1268-69 (emphasis in original). In other words, although ascertaining the change in runoff levels may be relevant to the issue of *damages*, "the issue as to *liability* is not whether, in hindsight, runoff was in fact affected, but whether the statutory duties were triggered by the potential of such effects." *Id.* (emphasis added). Once Columbia began construction, it had a duty to implement adequate stormwater controls, and the Marcums presented sufficient evidence for the jury to conclude that it did not.

## III.   MOTION FOR NEW TRIAL OR REMITTITUR

Columbia next moves for a new trial under Rule 59(a) on the basis that the Court abused its discretion by excluding the Act 167 Verification Report as hearsay or, in the alternative, remittitur under Rule 59(e) on the basis the jury's damage award was excessive and unsupported by the evidence at trial. Both motions shall be denied.

### A.  New Trial

#### i.  *Legal Standard*

"The decision to grant or deny a new trial is [confined] almost entirely to the discretion of the district court," *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992), but such requests are disfavored, *e.g.*, *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). District courts have recognized that (1) a prejudicial error of law, (2) a verdict against the weight of the evidence, or (3) an excessively high verdict may be ground for a new trial. *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa.), *aff'd*, 983 F.2d 1051 (3d Cir.

1992).  "The Court's inquiry in evaluating a motion for a new trial on the basis of trial error is twofold.  It must first determine whether an error was made in the course of trial, and then it must determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'"  *Price v. Trans Union, L.L.C.*, 839 F. Supp.2d 785, 792 (E.D. Pa. 2012) (quoting *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993)).

        ii.   *Discussion*

        During cross-examination of Rocco, Columbia's counsel introduced as a trial exhibit the Act 167 Verification Report prepared by GAI Consultants engineer Robert Matejczyk.  The report was admitted into evidence without objection from Plaintiffs and published to the jury. Columbia's counsel asked Rocco five questions about the report: whether it was sent to CCCD's district manager, whether it contained the heading "Act 167 Plan Verification Report," whether it contained the seal of a professional engineer, whether the engineer's seal constituted a "verification," and whether the first paragraph gave a description of pipeline construction activities in Chester County.  After the fifth question, which was the first to elicit testimony about the report's substance, Plaintiffs objected on the basis that the report was hearsay.  In response to this objection, Columbia argued that the report fell under Federal Rule of Evidence 803(8)'s hearsay exception for public records.  Plaintiffs rebutted this argument by noting that the report was not itself "[a] record or statement of a public office," *id.*, but rather a document submitted by Matejczyk to a public office.  The Court then ruled that the report was inadmissible and instructed the jury to disregard any testimony by Rocco pertaining to it.  Columbia does not assert that the Court excluded the report based on an incorrect application of the law of hearsay exceptions; instead, Columbia argues that Plaintiffs' objection was untimely, and the Court erred

by entertaining and ruling on it.  Columbia asserts that the objection was untimely for two

reasons: (1) because it was not raised pretrial, and (2) because it was raised after the report had

been initially admitted.

On the first point, Plaintiffs did not waive their ability to object to the report's

admissibility by failing to raise the objection before trial.  Rule 26(a) requires pretrial disclosure

of documents and exhibits that may be presented at trial.  Fed. R. Civ. P. 26(a)(3)(A)(iii).

"Unless the court orders otherwise," these disclosures are to be made at least thirty days before

trial, and objections to admissibility are to be made within fourteen days of disclosure "unless the

court sets a different time."  Fed. R. Civ. P 26(a)(3)(B).  "An objection not so made—except for

one under Federal Rule of Evidence 402 or 403—is waived unless excused by the court for good

cause."  *Id.*  In this case, the Court did order otherwise and provided a different set of deadlines

for pretrial disclosure of trial exhibits.

The Court's scheduling order directed both parties to file pretrial memoranda that

included "[a] list of all exhibits pre-numbered and pre-exchanged among all counsel, including

those exhibits whose introduction into evidence is objected to and the reasons for the

objections[.]"[8]  Ahead of the Final Pretrial Conference held on June 17, 2022, Plaintiffs were

directed to file their pretrial memorandum by June 7 and Columbia was directed to file its

pretrial memorandum by June 14.  Plaintiffs filed their pretrial memorandum on June 7 as

required, and in it stated that at the time of filing, they had not yet received Columbia's exhibit

list.  Plaintiffs will not be faulted for failing to raise a pretrial objection to the admissibility of the

---

[8] The scheduling order's language reflects the Court's Policies and Procedures, which require pretrial memoranda to include "[a]ny objection to . . . the admissibility for any reason (except relevancy) of any evidence expected to be offered."  Policies and Procedures, Beetlestone, J., January 2020, at 9.  The Policies and Procedures also specify that, despite the requirement to prepare exhibit lists beforehand, "[t]he Court will rule on the admissibility of individual exhibits in the course of trial."  *Id.* at 11.

report when they were unable to do so in their pretrial memorandum, the setting prescribed by the Court for raising such objections, even if they could have later raised an objection at the Final Pretrial Conference.  *See* Policies and Procedures at 10 (stating that "Counsel shall also be prepared to address any objections to admissibility of documents on the opposing party's exhibit list" at the Final Pretrial Conference, but not requiring objections to be raised).

As to Columbia's second argument, Plaintiffs' objection at trial may have been belated but Columbia has not established that the Court's ruling constituted error.  "The appropriate time to raise an objection is as soon as the party knows or reasonably should know of the grounds for objection. . . . "  *Gov't of the V.I. v. Archibald*, 987 F.2d 180, 184 (3d Cir. 1993); *see also Benjamin v. Peter's Farm Condominium Owner's Ass'n*, 820 F.2d 640, 642 n.5 (3d Cir. 1987). This requirement "promotes judicial economy by enhancing the trial court's ability to remedy the asserted error." *Archibald*, 987 F.2d at 184.  Plaintiffs argue that they did not realize the report was being introduced for objectionable purposes until Columbia began eliciting testimony relating to its substance.  They contend that this assumption was based on Columbia's motion *in limine* seeking to exclude argument or evidence that Columbia did not obtain permits from Caln Township, which motion *in limine* was granted.[9]

According to Plaintiffs, they viewed the Verification Report as addressing the same issue Columbia had successfully moved to exclude, and therefore assumed Columbia was only introducing the report for the limited purpose of establishing that it had been submitted.  This assumption was based on an overly broad reading of either the Court's ruling or the report itself. The report contains Matejczyk's conclusion that Columbia's stormwater management plans were in compliance with certain sections of Chester County's Model Ordinance, which the report's

---

[9] A motion for reconsideration of this ruling was granted later in the trial, but the Court's original ruling was still in effect when Plaintiffs made their objection to the report's admission.

header notes governed Caln and various other townships.  But it does not reference or constitute a permitting determination.  Instead, it was intended to certify that Columbia was in compliance with the local ordinances (or portions of them) despite *not* obtaining township permits.  The Court's motion *in limine* ruling specifically applied to township permits, not any pre-construction opinion or determination that Columbia was in compliance with local ordinances; it therefore did not exclude the report.  That the report was potentially being introduced for its substance therefore should have been apparent to Plaintiffs before the question that prompted their objection.  However, "[w]hen evidence has been admitted without objection, the district court has discretion in deciding whether or not to grant a motion subsequently made to strike the testimony on hearsay or best evidence grounds." *Belmont Indus., Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434, 437 (3d Cir. 1975).  Here, Plaintiffs' objection was made soon enough that the Court could exclude the report before the jury saw it in detail or heard testimony about its substance. *Archibald*, 987 F.2d at 184.

Moreover, a new trial is only warranted if the movant establishes prejudice. *See Price*, 839 F. Supp.2d at 792.  In making a technical argument focused on Plaintiffs' purported waiver of their objection, Columbia makes no attempt to argue that the report was in fact properly admissible under the Federal Rules of Evidence.  Although Columbia notes that juries may consider otherwise inadmissible evidence admitted without objection, *see, e.g.*, *Belmont Indus., Inc. v. Bethlehem Steel Corp.*, 62 F.R.D. 697, 701-02 (E.D. Pa. 1974), it fails to point to any support for its contention that a party is prejudiced by the exclusion of inadmissible evidence. *Cf. Dicks v. United States*, 2010 WL 11484356, at *5 (E.D. Pa. Sept. 8, 2010) (holding that petitioner was not prejudiced by counsel's failure to introduce inadmissible evidence).

Furthermore, admitting the report and permitting further testimony as to its substance

18

may have provided additional evidence in Columbia's favor, but there is no indication its admission would have changed the verdict.  *See Park v, Ahn*, 778 F. App'x 129, 133 (3d Cir. 2019) (holding that the district court did not abuse its discretion by denying a motion for new trial based on the erroneous admission of evidence "because any error in the admission . . . would not have affected the outcome of the trial").  Columbia claims that the Verification Report would have provided the jury with the proof it complied with the SWMA necessary to negate the Marcums' claims.  But the jury did hear evidence that Columbia submitted the Verification Report and that PADEP considered the SWMA prerequisites of the ESCGP-2 permit satisfied on that basis.  As discussed in Section II.C.ii *supra*, pre-construction determinations of SWMA compliance did not foreclose a finding of post-construction liability, so further evidence on this point would not counter the Marcums' evidence that Columbia's stormwater controls were inadequate.[10]

## B.  Remittitur

### i.  *Legal Standard*

Remittitur "is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."  *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 715 (3d Cir. 2010).  "There must be a rational relationship between the specific injury sustained and the amount awarded."  *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987).  However,

---

[10] Moreover, even if it were admissible and had been admitted, the substance of the report provides equivocal support for the conclusion that Columbia established pre-construction compliance with the provisions underlying the Marcums' claims.  The Verification Report concluded that the ESCGP-2 application met Chester County's SWMA requirements because it "adequately addressed" three sections of Chester County's Model Ordinance: Section 305 ("Water Quality and Runoff Volume Requirements"), Section 306 ("Infiltration Requirements"), and Section 308 ("Stormwater Peak Rate Control Requirements").  The Marcums alleged that Columbia violated the Caln Township ordinance that corresponded to Section 105 of the Model Ordinance, and the Verification Report does not specifically address compliance with this provision.

"it is undisputed that the court may not vacate or reduce the award merely because it would have granted a lesser amount of damages," but rather may only "disturb a jury verdict" if the jury's award is "so unreasonable as to offend the conscience of the Court." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).[11]

### ii. *Discussion*

Columbia argues that remittitur is required because the jury's award of $850,000 was unsupported by the evidence, which it claims established damages of approximately $75,500. Evaluating the basis of the jury's award is complicated by the fact that the jury did not provide itemized damages. Although the verdict sheet directed the jury to provide separate dollar amounts for four categories of damages, if applicable—(1) reduction in value, (2) cost of partial repairs, (3) loss of use, and/or (4) discomfort and use as occupant—they requested, and were permitted, to instead award a single, un-itemized sum of $850,000 in "total compensation."[12]

---

[11] Non-precedential Third Circuit decisions have come to opposing conclusions on whether, following the Supreme Court's decision in *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996), federal or state standards govern review of jury verdicts. *Compare Brennan v. Durgi*, 296 F. App'x 244, 245 (3d Cir. 2008) ("Our review [of a jury damages award] is governed by state law. . . ."), *with Olechna v. Dinoia*, 45 F. App'x 98, 100 n.3 (3d Cir. 2002) ("It is well-settled . . . that the denial of a new trial under Federal Rule of Civil Procedure 59 is a matter of procedure governed by federal law and not state law."). In *Gasperini*, the Court held that review of a jury award for excessiveness was governed by the New York state standard, rather than the federal standard. 518 U.S. at 439. The New York standard (a "deviates materially" standard) was adopted to "tighten[] the range of tolerable awards" compared to those allowed under the federal "shock the conscience" standard. *Id.* at 425-26. Because the choice of standard could result in different awards, the Court determined that the rule was outcome determinative, implicating the *Erie* doctrine's "twin aims" of "discouragement of forum-shopping and avoidance of inequitable administration of laws," and rendering it substantive rather than procedural. *Id.* at 427-31.

Here, because the federal standard (the jury's verdict must "shock[] our conscience," *Williamson*, 926 F.2d at 1353) and the Pennsylvania standard (the jury's verdict must "shock[] one's sense of justice," *Neison v. Hines*, 653 A.2d 634, 636 (Pa. 1995)) are essentially the same and therefore do not implicate the *Erie* concerns underlying *Gasperini*, the federal standard will be applied. *See Olechna*, 45 F. App'x 100 n.3 (determining that the federal and Pennsylvania standards are "substantially similar" and reliance on one over the other "is of no real consequence").

[12] The Marcums note that they asked that the jury be required to itemize their award, and it was Columbia who argued that a single lump sum was sufficient.

Columbia contends that the Marcums only presented evidence of, at most, approximately $75,500 in damages: $60,500 in repairs and expenses,[13] and a $10,000 to $15,000 reduction in property value as a result of the 2018 sinkhole.  However, Columbia arrives at the latter number by mischaracterizing the testimony it cites.  Kerstin Marcum testified that, based on the prices of comparable homes listed on the real estate website Zillow, the Marcums' home would be valued at approximately $500,000 to $525,000 if not for the problems caused by the pipeline.  She reduced that estimate by $10,000 to $15,000 based on "preexisting water intrusion issues" affecting the home.  Columbia claims that by "preexisting water intrusion issues," she meant the damage the Marcums claim was caused by the pipeline.  It is clear from the context of her testimony that she did not, but was instead referring to recurring basement flooding that Scott Marcum testified began prior to 2015 and the construction of the 1278 line.  In the testimony referenced by Columbia, Kerstin Marcum was establishing the home's baseline value without the damage caused by the pipeline.  The $10,000 to $15,000 figure represented damage preceding the pipeline, and therefore not attributable to Columbia and excluded from her estimate.  Marcum's testimony established that, but for the 1278 line, the Marcums' house would be worth between $485,000 and $515,000.

Marcum then provided her estimate of the house's value given the damage caused by Columbia, in light of Pennsylvania real estate disclosure requirements: "worthless." Pennsylvania's Real Estate Seller Disclosure Law requires sellers to "disclose to the buyer any material defects with the property known to the seller."  68 Pa. Cons. Stat. § 7303.  A material defect is "[a] problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to

---

[13] Specifically: $15,000 - $25,000 in repairs to a stone wall and steps; $14,500 in driveway repairs; $10,000 to modify the property's grade; and $11,000 in engineering expenses.

people on the property," and specifically includes "[s]oils, drainage, boundaries and sinkholes." *Id.* §§ 7102, 7304.  Marcum testified that, because of these required disclosures and because no one "would buy a house that has sinkholes that were there and still forming," the house was unsellable.[14]  She also testified that a potential buyer was interested in the house, but stopped contacting the Marcums after they disclosed its history.

The jury appears to have credited this testimony, as they were entitled to.  *See Richards v. Sun Pipe Line Co.*, 636 A.2d 1162, 1165 (Pa. Super. 1994) (A homeowner is "deemed qualified, by reason of his [or her] relation as owner, to give estimates of the value of what he [or she] owns *regardless of his [or her] knowledge of property values*, and the weight of such evidence is for the jury." (quoting *Pavloff v. City of Clairton*, 22 A.2d 74, 75 (Pa. Super. 1941))).  The jury also appears to have accepted the Marcums' argument that, because of their disclosure obligations, the harm done to their property could not be repaired.  Consistent with Pennsylvania law, the jury was instructed:

> If you find Columbia liable, the Marcums are entitled to be compensated for the harm done to their property. If you find that the property was a total loss, damages are to be measured by its market value at the time of the loss.  If the property was not a total loss and the harm is reparable, damages are measured by the reduction in market value or the reasonable cost of repairs, whichever is less.  If the property was not a total loss, but some harm is partially reparable and some harm is permanent, damages may include the reasonable cost of repairs, in addition to the reduction in market value.

> The Marcums are also entitled to be compensated for incidental costs or losses reasonably incurred because of the damage to the property, such as loss of use of the property and the discomfort and annoyance caused by Columbia's actions.

---

[14] The Real Estate Seller Disclosure Law does not require sellers to disclose defects they reasonably believe "had been corrected."  68 Pa. Cons. Stat. § 7309(a)(2).  However, the Marcums presented evidence—a 2018 sinkhole repair plan prepared by Columbia pipeline integrity engineer, Justin Taylor—indicating the sinkholes might recur.  Taylor also testified that the sinkholes were likely due to the "piping effect," whereby water seeps into the looser soil surrounding the pipeline and causes erosion.  He testified that this erosion could occur even if the soil around the pipeline were properly compacted.

Under Pennsylvania law, harm is considered permanent and non-reparable in "those instances where the damage was caused by a de facto taking or where the injury was unequivocally beyond repair." *Kirkbride v. Lisbon Contractors, Inc.*, 560 A.2d 809, 812 (Pa Super. 1989). The Marcums' argument that Columbia harmed their property "beyond repair," not through physical damage but by creating a material defect that requires disclosure and thereby destroys the home's salability may be a theory that is not palatable to Defendant but it is not thereby impermissible. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("[P]laintiffs convincingly argue that the stigma associated with the prior presence of PCBs [polychlorinated biphenyls] on their land constitutes permanent, irremediable damage to property under Pennsylvania case law such that they can recover for the diminution of value of their land."). Between $485,000 and $515,000 of the jury's $850,000 award can therefore be traced back to Kerstin Marcum's testimony regarding the property's market value.

The Marcums argue that the remaining $335,000 to $365,000 of the award includes damages for future loss of use, discomfort, and annoyance. Such an award is consistent with the Court's instructions to the jury on damages. The Court's general instruction on damages, taken verbatim from Pennsylvania's model civil jury instructions, included: "The amount you award today must compensate plaintiffs completely for damages sustained from the time of the harm up to today, as well as damages plaintiffs will sustain in the future." Neither side objected to this instruction. The Court further instructed the jury that: "The Marcums are also entitled to be compensated for incidental costs or losses reasonably incurred because of the damage to the property, such as loss of use of the property and the discomfort and annoyance caused by Columbia's actions." This instruction was consistent with Pennsylvania law, which has "long recognized that where injury is sustained to real property as a result of the negligence of another,

the property owner is entitled to damages for the inconvenience and discomfort caused thereby." *Houston v. Texaco*, 538 A.2d 502, 505 (Pa. Super. 1988) (citing *Dussell v. Kaufman Constr. Co.*, 157 A.2d 740, 745 (Pa. 1960)).

This instruction was proposed by the Marcums and adapted from the Restatement (Second) of Torts § 929.  Section 929 states that damages for "loss of use" or "discomfort and annoyance" are only available when harm to property does "not amount[] to a total destruction of value."  However, although the Superior Court in *Houston*, 538 A.2d at 745, cited this section of the Restatement as providing additional support for the recognition of this category of damages, it has not been adopted by the Pennsylvania Supreme Court and "deemed . . . a proper statement of Pennsylvania law. . . ." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 354 (Pa. 2014). Pennsylvania law, therefore, remains unsettled as to the availability of "loss of use" damages in cases where property damage is determined to be non-reparable.

In proposing the instruction, the Marcums cited to the Restatement but modified its language.  They indicated in strikethrough that they proposed omitting Section 929's language limiting these damages to instances of reparable harm.  Although Columbia objected to the proposed instruction at the charging conference it did so on other grounds—the same grounds raised here, that the evidence did not support a finding of loss of use, discomfort, or annoyance. Because Columbia failed to object to the *legal* basis of this instruction during trial, and the Marcums' modifications should have put it on notice that this ambiguity was potentially implicated, it cannot now serve as the basis for granting a remittitur.  *See* Fed. R. Civ. P. 51(c) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."); *Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) ("Such an objection must be . . . specific to the

alleged error.").

Furthermore, contrary to Columbia's contentions, the evidence at trial did support a finding of future loss of use, discomfort, or annoyance.  Kerstin Marcum testified that the sinkholes in her yard left her "[s]cared" and "[v]ery concerned," and that she worried about the risk they posed to neighborhood children who routinely cut across the yard.  She also testified that basement flooding increased "tremendously" in frequency after the pipeline construction. Scott Marcum testified that the sinkholes reduced the usable portion of the yard and that sinkhole remediation, when it occurred, involved heavy equipment that dug up areas of the yard spanning across the yard to the street.  He also testified that increased runoff damaged stone landscaping features near the house, damaged root systems of trees, and left sediment deposits on the patio. The amount awarded—$335,000 to $365,000—is not an insubstantial amount.  But it is not unreasonable given the Marcums' testimony.  In that the evidence does not establish that the jury's award was "clearly unsupported," irrational, or unreasonable, Columbia's Motion for Remittitur shall be denied.  *Spence*, 806 F.2d at 1201.

## IV.    CONCLUSION

For the reasons stated above, Columbia's Motion for Judgment as a Matter of Law will be denied; Columbia's Motion for a New Trial will denied; and Columbia's Motion for Remittitur will be denied.

An appropriate order follows.

BY THE COURT:

/S/WENDY BEETLESTONE, J.

_____

**WENDY BEETLESTONE, J.**

25